TIMOTHY T. SCOTT (State Bar No. 126971)
tscott@kslaw.com
KING & SPALDING LLP
601 South California Avenue, Suite 100
Palo Alto, CA 94304
Telephone:   (650) 422-6700
Fax:            (650) 422-6800

JEFFREY S. CASHDAN (Admitted Pro Hac Vice)
jcashdan@kslaw.com
ZACHARY A. MCENTYRE (Admitted Pro Hac Vice)
zmcentyre@kslaw.com
JULIA C. BARRETT  (Admitted Pro Hac Vice)
jbarrett@kslaw.com
KING & SPALDING LLP
1180 Peachtree St.
Atlanta, GA 30309
Telephone: (404) 572 4600
Facsimile: (404) 572 5100

Counsel for Defendants
PROGRESSIVE SELECT INSURANCE
COMPANY AND PROGRESSIVE CASUALTY
INSURANCE COMPANY

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOBBY JONES, individually and on behalf of all other similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>PROGRESSIVE SELECT INSURANCE COMPANY, PROGRESSIVE CASUALTY INSURANCE COMPANY, and MITCHELL INTERNATIONAL, INC.; and DOES 1 through 50, inclusive,<br><br>            Defendants, | Case No. 3:16-cv-06941 JD<br><br>**PROGRESSIVE SELECT INSURANCE COMPANY AND PROGRESSIVE CASUALTY INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................ 3

    A.     Plaintiff's Collision and the Total Loss Determination ................................... 3

    B.     Plaintiff's Initial Valuation ................................................................. 3

    C.     Plaintiff's Negotiations and Eventual Settlement ............................................ 5

    D.     Progressive's Obligations Under The Policy And California
        Insurance Regulations ................................................................................. 7

    E.     This Lawsuit And Plaintiff's Motion For Class Certification ........................ 8

        1.     Plaintiff's Misuse Of Facts And Evidence Submitted In
            *Slade* In Support Of The Motion. ................................................. 9

        2.     Plaintiff's Experts Confirm This Case Cannot Be Certified
            As A Class. ................................................................................. 11

III.    ARGUMENT ................................................................................................ 13

    A.     Plaintiff Bears The Burden Under Rule 23 ................................................. 13

    B.     Individual Issues Predominate ................................................................. 14

        1.     The dealer quote valuation process is inherently
            individualized. ............................................................................. 14

        2.     Plaintiff has not met his burden of identifying any
            common questions that will predominate over the myriad
            individual issues involved in valuing total-loss claims. .................... 16

        3.     Plaintiff fails to present a damages methodology that
            aligns with his theories of liability. .................................................. 19

    C.     Plaintiff Cannot Satisfy the Requirements of Rule 23(a) ............................ 21

        1.     Plaintiff has not presented evidence that the putative class
            is sufficiently numerous. ................................................................. 21

        2.     There are no common questions of fact or law. .............................. 22

        3.     Plaintiff's claims are atypical. ....................................................... 23

    D.     Plaintiff Fails To Meet The Requirements For Certifying A Rule

i

23(b)(2) Injunctive Class. ...............................................................................24

E.   Plaintiff Fails To Demonstrate That Any "Issue" Class Can Be
Certified Under Rule 23(c)(4)........................................................................25

IV.   CONCLUSION...........................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brown v. Nat'l Life Ins. Co.*,
  2013 WL 12096508 (C.D. Cal. Oct. 15, 2013)....................................................................16

*Bruton v. Gerber Products Co.*,
  2018 WL 1009257 (N.D. Cal. Feb. 13, 2018) ....................................................................20

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)....................................................................................13, 18, 19, 21

*Diacakis v. Comcast Corp.*,
  2013 WL 1878921 (N.D. Cal. May 3, 2013) ....................................................................22

*Ekdahl v. Ayers*,
  2008 WL 4344314 (N.D. Cal. Sept. 22, 2008) ....................................................................10

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ....................................................................................13, 22, 23

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ....................................................................................24

*Hargreaves v. Associated Credit Servs., Inc.*,
  2017 WL 4543791 (E.D. Wash. Oct. 11, 2017) ....................................................................22

*In re High-Tech Employee Antitrust Litig.*,
  289 F.R.D. 555 (N.D. Cal. 2013)....................................................................................22

*Lasar v. Ford Motor Co.*,
  399 F.3d 1101 (9th Cir. 2005) ....................................................................................10

*Lierboe v. State Farm Mut. Aut. Ins. Co.*,
  350 F.3d 1018 (9th Cir. 2003) ....................................................................................14

*Marlo v. United Parcel Serv., Inc.*,
  251 F.R.D. 476 (C.D. Cal. 2008)....................................................................................18

*In re Myford Touch Consumer Litig.*,
  2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ....................................................................19

*Nguyen v. Nissan N. Am., Inc.*,
  Case No. 16-CV-05591-LHK (Dkt. No. 63) (N.D. Cal)....................................................................21

ii

*In re Optical Disk Drive Antitrust Litig.*,
 303 F.R.D. 311 (N.D. Cal. 2014)............................................................................14, 23, 24

*Rahman v. Motts LLP*,
 2014 WL 6815779 (N.D. Cal. Dec. 3, 2014) ...................................................................19

*Santos v. TWC Admin. LLC*,
 2014 WL 12558009 (C.D. Cal. Aug. 4, 2014)...........................................................14, 16

*Siles v. ILGWU Nat. Ret. Fund*,
 783 F.2d 923 (9th Cir. 1986) ...........................................................................................22

*Slade v. Progressive Security Ins. Co.*,
 856 F.3d 408 (5th Cir. 2017) .....................................................................................10, 17

*Slade v. Progressive Select Ins. Co.*,
 Case No. 6:11-cv-02164-RFD-CBW (W.D. La.) .......................................................9, 10, 17

*Stockwell v. City and County of San Francisco*,
 2015 WL 2173852 (N.D. Cal. May 8, 2015) ...................................................................18

*Tietsworth v. Sears, Roebuck and Co.*,
 2012 WL 1595112 (N.D. Cal. May 4, 2012) ...................................................................24

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011).............................................................................................14, 23, 24

*Wang v. Chinese Daily News, Inc.*,
 737 F.3d 538 (9th Cir. 2013) .....................................................................................13, 23

*Werdebaugh v. Blue Diamond Growers*,
 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ................................................................20

*Zinser v. Accufix Research Inst., Inc.*,
 253 F.3d 1180 (9th Cir. 2011) ....................................................................................24, 25

**Statutes**

California's Business and Professions Code § 17200.....................................................................8

California's Consumer Legal Remedies Act § 1750 .......................................................................8

La. Rev. Stat. 22:1892...............................................................................................................9, 10

**Other Authorities**

Ca. Code Reg. § 2695.8 ................................................................................................................7

Federal Rule of Civil Procedure 23 .................................................................................. *passim*

Defendants Progressive Select Insurance Company ("Progressive Select") and Progressive Casualty Insurance Company (collectively "Progressive") submit this Opposition to Plaintiff's Motion for Class Certification.

## I.      INTRODUCTION

Plaintiff Bobby Jones's Motion for Class Certification falls well short of demonstrating that the requirements of Rule 23 are satisfied.  Despite over a year of fact discovery, Plaintiff's motion is based not on facts, but on conclusory allegations about alleged total-loss valuation practices and misplaced reliance on a different case pending in the Western District of Louisiana involving a purported Louisiana class for violation of a Louisiana statute. The relevant facts and law in *this* case, however, establish that Plaintiff's claims challenging the amount he received for his total-loss vehicle are particularly ill-suited for classwide adjudication. The defects in Plaintiff's Motion are abundant.

*First*, Plaintiff fails to demonstrate that common issues predominate over the myriad individual issues involved in valuing total-loss claims. Plaintiff's total-loss claim exemplifies the individualized nature of the total-loss valuation process. Plaintiff negotiated with the Progressive adjuster who handled his total-loss claim for more than two weeks regarding the selection of comparable vehicles and the adjuster's assessment of the condition of his loss vehicle. Continually working with Plaintiff to address his concerns regarding valuation of his older vehicle, Progressive presented Plaintiff with four different valuation reports using two different valuation methodologies—neither of which is the methodology Progressive uses for more than 90% of California total-loss claims. Ultimately, Plaintiff accepted a settlement based on the fourth valuation report, which reflected actual cash value derived from quotes that Progressive's vendor, Mitchell International, Inc. ("Mitchell"), obtained from two used car dealers in Plaintiff's area. While every total-loss adjustment is unique, Plaintiff's is deeply idiosyncratic: It involved individual condition inspections, unusual processes for identifying comparable vehicles, and individual negotiations resulting in multiple concessions to the insured. Trying Plaintiff's claims on these unusual facts would do nothing to resolve the claims of any other Progressive total-loss insured.

Progressive's Opposition to Class Certification                                    Case No. 3:16-cv-06941 JD

*Second*, Plaintiff does not offer a methodology to determine injury or damages for each member of the alleged class that aligns with any of his alternating theories of liability. Plaintiff continues to hurl every conceivable complaint against Progressive's valuation practices—*e.g.*, the use of salvage-title comparable vehicles, "double dipping" for condition, and fabricating dealer quotes—but he provides no evidence of a classwide methodology for calculating damages resulting from these alleged practices. Plaintiff's purported method of using the estimated values from the NADA Guide or the Kelly Blue Book—which instruct users to adjust values based on their own subjective condition adjustments—could not possibly measure injury and damages for the alleged practices Plaintiff challenges. Nor would their use even comply with the requirements of California law. Even Plaintiff's own experts confirm that valuing a total-loss vehicle always requires individual inquiry and disclaim any notion that they have proposed a methodology for determining whether any particular alleged class member (including Plaintiff) has been injured or damaged in this case.

*Third*, Plaintiff fails to provide evidentiary support satisfying Rule 23(a)'s requirements. Plaintiff fails to provide any evidence of a single other purported class member whose total-loss claim was valued on the basis of allegedly fraudulent dealer quotes, thus failing to satisfy the numerosity requirement. The "common" questions Plaintiff alleges merely recite the generic question of whether Progressive violated the law, and are otherwise incapable of generating common answers apt to drive resolution of this litigation. Finally, Plaintiff's claim is markedly different from the various classes he purports to represent, making him subject to multiple unique defenses and rendering his claims atypical. Each of these failures, alone, precludes class certification.

It is incumbent on Plaintiff to come forth with evidence to satisfy each of Rule 23's requirements, thereby allowing this Court to conduct the required "rigorous" analysis on class certification. Plaintiff falls far short of his burden. Accordingly, the Motion should be denied.

Progressive's Opposition to Class Certification                    Case No. 3:16-cv-06941 JD

## II.    BACKGROUND

### A.    Plaintiff's Collision and the Total Loss Determination

On November 18, 2015, Plaintiff was in an accident while driving his 1999 Chevrolet Venture. (Dkt. 106, Third Amended Complaint ("TAC") ¶ 38). Plaintiff made a claim with his insurer, Progressive Select, which sent a managed repair representative ("MRR") to inspect Plaintiff's vehicle.  (TAC ¶ 44; S. Cordice Dep. at 18:6-14 (Ex. A)). The MRR determined that the vehicle was a total loss. (TAC ¶ 46). Accordingly, Progressive Select was obligated to pay Plaintiff the "actual cash value" of his totaled vehicle. (Dkt. 130-1, Policy, Part IV at p. 22). The Policy provides that Progressive estimates "actual cash value" taking into account the "market value, age, and condition of the vehicle at the time the  loss occurs" (*id.* § 2 at p. 23), and permits Progressive Select to "use estimating, appraisal, or injury evaluation systems," including "computer software, databases, and specialized technology." (*Id.* Part VII at p. 29).

### B.    Plaintiff's Initial Valuation

In accordance with the Policy, the MRR began the process of determining the actual cash value of Plaintiff's totaled vehicle using WorkCenter Total Loss ("WCTL"), a technology solution provided by Mitchell that Progressive uses to assist it in estimating the "actual cash values" of totaled vehicles. (Ex. A at 18:6–21:1). In more than 90% of total-loss claims, WCTL identifies a sufficient number of local comparable vehicles to generate an automated total-loss report based on the loss vehicle's Vehicle Identification Number ("VIN"), mileage, and condition. (J. Riddesel Dep. at 23:1-3 (Ex. B)). Accessing a database containing dealer sale and list prices from various sources, including JD Power and the California Department of Motor Vehicles, WCTL identifies vehicles of the same year, make, and model as the loss vehicle in close proximity to the loss vehicle. (Ex. B at 42:11-43:18; M. Reynolds Dep. at 28:3–29:3 (Ex. C)). In California, WCTL looks for comparable vehicles within a 300-mile radius. (Ex. B at 28:1-8). In the rare event the automated system cannot locate a sufficient number of comparable vehicles within 300 miles of the loss vehicle, it does not generate an automated report. (*Id.*; Ex. C at 67:24–69:5).

Plaintiff's was one of the rare cases. WCTL could not locate a sufficient number of local vehicles comparable to Plaintiff's 1999 Venture, and thus did not generate an automated valuation report.[1] (Ex. C at 67:24–68:13). Instead, on November 25, 2015, Mitchell prepared a different valuation report, called a Market Survey Report. (Dkt. 130-3). To prepare a Market Survey Report, Mitchell manually searches for comparable vehicles, rather than identifying them automatically through its database. (Ex. B at 38:9-13). The November 25, 2015 Market Survey Report includes two comparable vehicles—one from Oregon and another from Oklahoma. (Dkt. 130-3). The copy of the Report provided to Plaintiff disclosed that the comparable vehicles were located using this methodology. (*Id.* at 5 (explaining the "comparable vehicle has been located through market research")).

The Market Survey report estimated the actual cash value of Plaintiff's loss vehicle based on the list prices for the comparable vehicles Mitchell's researchers found, adjusted to reflect the condition of Plaintiff's loss vehicle. (Dkt. 130-3). When WCTL generates a valuation based on comparable vehicles, it is often necessary to adjust the value of the comparable vehicles to take into account the actual condition of the total-loss vehicle. In the case of WCTL automated valuations, the comparable vehicles are presumed to be in "typical" condition for used vehicles sold by dealers (as that is the source of the data). (Expert Report of Dr. Barnett, Ex. B, at 6 (Ex. D); *see also* J. McCauley Dep. at 69:2-12 (Ex. E)). In unusual scenarios, like Plaintiff's, that require a Market Survey Report, the Mitchell representative who performs the manual research to find comparable vehicles makes an assessment to ensure that the comparable vehicles are in typical condition for a vehicle of that year, make, and model. (Ex. B at 56:16–57:5). In each instance, Progressive MRR's individually inspect the total-loss vehicle to determine its actual condition, rating each aspect of the vehicle on a scale from 1 to 5 (with "3" scaled to be "typical") based on instructions provided in the WCTL conditioning guide. (Ex. A at 22:1-7). WCTL then aggregates the various condition ratings for each section of the vehicle to reach an overall condition rating score, which is used to adjust the value of the comparable vehicles based on wholesale auction data that calculates the relative values of specific used vehicles based on

---

[1] Chevrolet started manufacturing the Venture in 1997 and discontinued it in 2005. *See* http://www.nadaguides.com/Cars/Chevrolet/Venture.

1    condition.  An MIT statistics professor, Dr. Arnold Barnett, has opined that this methodology is

2    statistically valid. (*See* Ex. D).

3         Plaintiff's vehicle was not in "typical" condition. Based on the Progressive MRR's "in

4    person inspection" of Plaintiff's vehicle (Ex. A at 21:21–22:7), WCTL reached an overall

5    condition rating score for Plaintiff's vehicle of 2.69.  (Ex. C at 52:4-15; *see also* Dkt. 130-3 at 3).

6    Based on the market survey comparable vehicles and adjustments made for the pre-loss

7    condition of Plaintiff's vehicle, Progressive offered Plaintiff $2,488.40 to settle his claim. (Dkt.

8    130-3; *see also* TAC ¶ 47).

9         **C.    Plaintiff's Negotiations and Eventual Settlement**

10        Plaintiff rejected the valuation of his vehicle in the initial Market Survey Report and, in a

11   series of email and telephone conversations, attempted to negotiate the value of his vehicle.  (B.

12   Jones Dep. at 44:18-46:10, 63:1–64:1 (Ex. F); Jones Dep. Ex. 3 (Ex. G); Mot. at 6 ("Between

13   November 18, 2015 and about December 7, 2015" Plaintiff engaged in "a series of email

14   communications" with Progressive "attempt[ing] to obtain a fair valuation for his total loss

15   vehicle")). Specifically, Plaintiff took issue with the MRR's assessment of his vehicle's

16   condition and the distance of the comparable vehicles from his vehicle.  (Ex. F at 43:1-14,

17   47:21–48:2; *see also* Jones Dep. Ex. 6 (Ex. H)). Plaintiff also wanted Progressive to consider the

18   amount he paid for his vehicle a month earlier as a "comparable" vehicle sale. (Ex. F at 46:18-

19   20; *see also* Ex. H). While Progressive does not have a policy for "such a one-off scenario that

20   the customer totals their vehicle that shortly after purchasing the vehicle," Progressive does pass

21   on information it receives from insureds to Mitchell. (Ex. C at 69:18–71:21). Whether that

22   information is considered in the valuation is up to Mitchell. (*Id.*).

23        Based on Plaintiff's complaints about the initial valuation report, Progressive made a

24   concession on the condition rating for the glass of Plaintiff's vehicle, and provided a second

25   Market Survey Report on November 30, 2015 with an increased value (due to the increased

26   condition rating) of $2,528.89. (Jones Dep. Ex. 5 (Ex. I); Ex. F at 82:3–84:4). This approach is

27   consistent with Progressive's practice of engaging customers in a dialogue to understand why the

28   customer disagrees with its valuation and reviewing documents the customer provides.  (Ex. A at

52:4-10, 54:23–55:2; Ex. C at 86:8-14; Ex. A at 78:2-13 (explaining that in Plaintiff's case he worked with a supervisor to make "changes [] to [Jones's] condition ratings in order to get him more money towards his total loss")). Plaintiff also rejected the second valuation amount, however, because he "still had an issue with the fact that the[] [comparable vehicles] were so far away" and some of the condition ratings. (Ex. F at 86:23–87:5; Mot. at 13 (admitting "the market survey approach was rejected by Bobby Jones")).

Due to Plaintiff's continuing concern with the out-of-state vehicles located as comparable vehicles for his Venture, and in an attempt "to find more value for Mr. Jones's vehicle," Progressive decided to use a third methodology to value Plaintiff's vehicle. (Ex. F at 95:17–96:4; Ex. A at 88:18–89:5, 95:8-20). At Progressive's request, a representative from Mitchell's service bureau contacted used car dealers to obtain quotes for the value of Plaintiff's vehicle. (Ex. A at 88:18–89:5). When the dealer-quote methodology is used, Mitchell contacts dealerships in proximity to the total-loss vehicle, describes the loss vehicle—including its condition—and asks the dealership their sale price for that vehicle at retail. (Ex. C at 82:9-24, 91:2-13). The Mitchell representatives are required to obtain a minimum of two dealer quotes to generate a dealer-quote valuation report. (Ex. B at 40:11-19). Because the dealer is provided with the condition of the loss vehicle, and no comparable vehicle values are used, no condition adjustment is made to the quote the dealer provides. (*Id.* at 40:21–41:3 (explaining the "adjustments are made by the dealer" based on the conditioning done by the appraiser)).

In Plaintiff's initial dealer-quote valuation, Calidad Motors provided a quote to Mitchell of $2,500, while Ace Auto Dealers quoted the value of Plaintiff's vehicle as $2,300. (Jones Dep. Ex. 7 (Ex. J)). These quotes were based on the representation that Plaintiff's vehicle was in "Fair/Good" condition, which was based on the individual MRR's assessment of the vehicle's condition. (*Id.*). After the initial dealer-quote valuation, Progressive further adjusted one of the condition ratings for Plaintiff's vehicle—changing the rating for Plaintiff's seats from a 2 to a 3. (Ex. F at 104:9–105:9). Mitchell then obtained quotes from the same dealers, this time representing that the condition of the Venture was "Good" rather than "Fair/Good." (Jones at

105:16-22; Jones Dep. Ex. 8 (Ex. K)). The change in condition resulted in a final dealer-quote valuation of $2,800. (Ex. K).

Plaintiff accepted the valuation of his loss vehicle based on the second dealer-quote valuation report dated December 2, 2015. (Ex. F at 107:14–108:25; Jones Dep. Ex. 9 (Ex. L)). After Progressive waived the deductible and adjusted for taxes, license, and other non-valuation factors, Progressive issued Plaintiff a check on December 17, 2015 for $3,159.00, which was approximately $91 less than Plaintiff paid for the vehicle one month earlier. (Jones Dep. Ex. 10 (Ex. M); Ex. F at 107:18-24, 114:10–115:11). The other driver's insurance company later reimbursed Progressive for that amount, as the other driver accepted full liability for the November 18, 2015 accident. (Declaration of Dr. Jonathan Walker, ¶ 6 (Ex. S); *see also* PROG-01-0000025-26 (Ex. O)).

### D. Progressive's Obligations Under The Policy And California Insurance Regulations

Progressive's use of WCTL to reimburse insureds for the actual cash value of their total-loss vehicle is consistent with its obligations under California law. California's Fair Claims Settlement Practices Regulations require insurers to value total-loss vehicles by averaging the "cost of two or more [] comparable automobiles" that were "available for retail purchase . . . in the local market area within ninety (90) calendar days of the final settlement offer." C.C.R. § 2695.8. "A 'comparable automobile' is one of like kind and quality, made by the same manufacturer, of the same or newer model year, of the same model type, of a similar body type, with options and mileage similar to the insured vehicle." *Id.* When comparable automobiles are not available in the local market area in the last 90 days, an insurer may use "the average of two or more quotations from two or more licensed dealers in the local market area." *Id.* The comparable vehicles used to value a total loss must be identified by their VIN or other identifying information specified in the regulation, and the telephone number or address of the seller of the vehicle must be provided. *Id.* In accordance with California law, WCTL provides valuations based on at least two comparable vehicles or quotes from licensed dealers in the local market area. (Ex. C at 66:25–67:3). Progressive does not use the NADA Guide to value total-loss

7

vehicles in California because it provides a regional rather than local valuation, and does not otherwise comply with the requirements of the California insurance regulations. (Ex. C at 66:1–67:3; Ex. B at 54:23–55:6 ("NADA uses an entire region and takes all of those vehicles into account.")).

**E.      This Lawsuit And Plaintiff's Motion For Class Certification**

On December 2, 2016, Plaintiff filed suit against Progressive and Mitchell disputing the valuation of his total-loss vehicle.  (Dkt. 1). In his Third Amended Complaint, Plaintiff asserts claims against Progressive for violation of California's Business and Professions Code § 17200 ("UCL"), fraud, negligent misrepresentation, breach of contract, bad faith, and violation of California's Consumer Legal Remedies Act ("CLRA"). (Dkt. 106). Plaintiff's breach of contract and bad faith claims are based on Plaintiff's allegation that Progressive failed to pay him the "actual cash value" of his total-loss vehicle as required by the Policy. (TAC ¶ 110). Plaintiff's fraud and negligent misrepresentation claims challenge the veracity of various statements Progressive employees made to Plaintiff while negotiating with him about his total-loss claim. (*Id.* ¶ 99).  And Plaintiff's UCL and CLRA claims allege that—in the process of valuing total-loss vehicles in California—Progressive engages in various unfair and/or deceptive business practices, including allegedly using salvage-title vehicles as comparable vehicles, failing to properly obtain dealer quotes, and "double dipping" for the condition of total-loss vehicles. (*See, e.g.*, *id.* ¶¶ 26, 34, 66, 91-92).  Progressive has moved to dismiss the Third Amended Complaint for failing to state a claim, and that motion remains pending.  (Dkt. 108).

Fact discovery closed on February 16, 2018, after Plaintiff obtained a three-month discovery extension. (Dkt. 92). Expert disclosures and discovery ended as of April 13, 2018 (except for two depositions to be conducted in May). *Id.* Plaintiff filed his motion for class certification on March 2, 2018. (Dkt. 130). Plaintiff seeks certification of the following purported classes:

> (1) An injunctive relief class and a monetary relief subclass of Progressive insureds in California who "received comparable vehicle information from Progressive or Mitchell for their first party total vehicle property loss;"

(2) Monetary relief subclasses of Progressive insureds in California who "did not receive adequate compensation for their first party total . . . loss" because Progressive either (a) used vehicles with salvage titles as comparable vehicles, or (b) acted "arbitrarily and capriciously in using market dealer survey reports without providing the insured [] information regarding the condition" of the comparable vehicles; and

(3) Monetary relief subclass of Progressive insureds in California who "received less than actual cash value for their claim . . . based on improper Mitchell WCTL condition valuation process, aka 'double dipping.'"

(Mot. at 1-2).

### 1. Plaintiff's Misuse Of Facts And Evidence Submitted In *Slade* In Support Of The Motion.

In a full year of fact discovery, Plaintiff failed to vigorously pursue discovery in this case, taking only three fact depositions (two during the week after the close of fact discovery). Rather than trying to discover facts relevant to his claims, Plaintiff tries to borrow snippets of publicly available information from *Slade v. Progressive Select Ins. Co.,* Case No. 6:11-cv-02164-RFD-CBW (W.D. La.) ("*Slade*") and pass it off as his own evidence. Plaintiff's attempt to use the evidence in *Slade* in support of his Motion is inappropriate for at least three reasons.

First, the evidence from *Slade* is irrelevant here. In *Slade*, the plaintiff's breach of contract claim hinges on the allegation that Progressive's use of WCTL violates a Louisiana statute, La. Rev. Stat. 22:1892, because WCTL allegedly is not a "generally recognized used motor vehicle industry source." *Slade*, Dkt. 1 (Dec. 16, 2011); *See* La. Rev. Stat. 22:1892. The plaintiff in *Slade* claims that the Louisiana statute requires Progressive to use the NADA Guide instead. *Slade*, Dkt. 115 (arguing for damages by comparing WCTL valuations to "permissible system[s] such as NADA"). Here, there is no claim that the mere use of WCTL, regardless of the value it produces, is contrary to California law and, indeed, California does not have an analog to La. Rev. Stat. 22:1892. In fact, as noted above, the use of NADA would not comply with California's insurance regulations. (Ex. C at 66:1–67:3; Ex. B at 54:23–55:6).

9

Second, Plaintiff seems to suggest that he performed the work in gathering the *Slade* evidence when, in reality, Plaintiff has never even seen the testimony, documents or exhibits on which he relies. For example, Plaintiff states: "Plaintiff's 12-month analysis of Progressive's records indicates that only 0.9%, or approximately 150, of the potential class members received a settlement adjustment." (Mot. at 11). But Plaintiff did no such analysis, and the record here contains no such analysis for California insureds.[2] Not surprisingly, Plaintiff does not even attempt to show the relevance of the evidence to this case, his claims, or class certification.

Third, the Fifth Circuit Court of Appeals vacated and remanded the Order on which Plaintiff relies for the vast majority of the purported factual findings in *Slade*. *See Slade v. Progressive Security Ins. Co.*, 856 F.3d 408 (5th Cir. 2017) (Ex. P). Thus, not only is the evidence irrelevant, the *Slade* Order Plaintiff cites is not authoritative on the question of certification of the Louisiana contract class in *Slade.* In any event, "[i]t is well-established that in federal court, the factual findings in one case ordinarily are not admissible for their truth in another case through judicial notice." *Ekdahl v. Ayers*, 2008 WL 4344314, at *2 (N.D. Cal. Sept. 22, 2008) (denying petitioner's request to take judicial notice of the "evidentiary record developed by the Eastern District" in a different case); *see also Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1117 n.14 (9th Cir. 2005) (same). For these reasons, the Court should disregard the facts, evidence, and testimony from *Slade* as it comes from a vacated order and is wholly irrelevant to certification of a California class for violation of California law.

---

[2] Plaintiff similarly purports to describe marketing presentations by Mitchell, but fails to acknowledge that Plaintiff has never seen these marketing presentations. (Mot. at 10). Yet another statistic Plaintiff misleadingly cites as his own is that "Progressive's own tracking . . . shows" that an "average of 78% of total loss vehicles received a downward condition adjustment." (*Id*.). None of this relates at all to Plaintiff or his proposed California class, and Plaintiff has no idea how this statistic was derived, what it means, or what the underlying documents or evidence show as to California insureds.

2.     **Plaintiff's Experts Confirm This Case Cannot Be Certified As A Class.**

Plaintiff purports to rely affirmatively on two experts in his Motion: Dr. Johnette Hassell and James McCauley. (Dkt. 130-16; 130-22). Their deposition testimony, however, confirms the inappropriateness of certifying any class in this action.

In his capacity as an "expert in buying and selling used cars . . . and otherwise evaluating the value of used cars" (Pl.'s Rule 26(a)(2) disclosures (Ex. Q)), McCauley testified that determining a vehicle's value depends most importantly on the condition and mileage of the vehicle (Ex. E at 102:3-10), that assessing condition "is going to vary vehicle to vehicle" (*id*. at 37:4–38:11), and that he is unaware of any way to determine a vehicle's condition other than individually looking at the specific vehicle (*id*. at 73:4–75:14). Moreover, McCauley expressly agreed that, to derive a vehicle's estimated value using either NADA or Kelly Blue Book, the user of those guides would have to make independent judgments and adjustments to the vehicle's estimated value based on the vehicle's condition. (*Id*. at 63:1-25; 74:5–75:14). As to the use of salvage-title vehicles as comparables, McCauley confirmed at his deposition that to discover this information, *i.e.*, by running a title search or obtaining a condition report using CarFax, he would need to conduct the search one vehicle at a time using a specific vehicle's VIN number. (*Id.* at 39:3–40:6, 49:22–50:5). He further confirmed that to adjust vehicle values in light of salvage titles would require individual analysis. (*Id.* at 80:17–81:18).

Hassell, a computer science expert, offers the limited expert opinions that there are "objective criteria" by which Progressive's California insureds who had a total-loss claim can be identified (Dkt. 130-16, ¶ 36); that she can "obtain valuation data from Mitchell (which includes NADA) and Bluebook using straightforward, computer-based, standard procedures" (*id.* ¶ 55); and that "[v]aluation results from NADA and Bluebook can be compared . . . to valuation results from [] WCTL" (*id.* ¶ 59). In other words, Hassell opines that she thinks certain NADA and Kelley Blue Book valuation data is available, and that she could create a database to compare that data to WCTL values. (*Id.* ¶ 66; Dr. J. Hassell Dep. at 27:15–28:13 (Ex. R)). Hassell, however, has not done any of this work; indeed, none of the NADA or Kelley Blue Book data

has been requested or obtained in discovery. (Ex. R at 27:1–28:17, 50:8–51:15). More fundamentally, Hassell offers *no opinion* on the central issues in this case, such as what are fair and accurate ways to value a total-loss vehicle, whether Progressive undervalued anybody's vehicle, and whether there is a common way to determine if Plaintiff or any class member has suffered injury or damage:

> Q And are you offering an opinion which of the alternative valuations is the most accurate?
> A No, I'm not.
> Q Are you providing any opinion regarding whether any particular valuation for any particular vehicle is inaccurate?
> A No, I'm not.
> Q Do you have an opinion whether the valuation that Progressive gave to Mr. Jones in this case was inaccurate?
> A I'm not offering an opinion on that. The only thing I'm offering an opinion on is the availability of the data and the ability to manipulate -- manipulate it.
> Q Are you offering an opinion as to whether the total loss valuation that Progressive provided to Mr. Jones was unfairly low?
> A No, I'm not -- I am not offering such an opinion.
> Q Are you offering an opinion as to whether the valuation that Progressive provided to Mr. Jones was improperly low?
> A No.
> Q Are you offering an opinion as to whether Progressive undervalued Mr. Jones' vehicle? A No.
> Q Are you offering an opinion as to whether Progressive has intentionally undervalued any vehicle?
> A Certain[ly] not on intent.
> Q Are you offering an opinion as to whether Mitchell has provided an inaccurate or unfairly low valuation for any vehicle?
> A That's not the opinions I'm offering.
> Q Are you providing an opinion as to whether Mitchell has intentionally undervalued any vehicle?
> A I'm not offering an opinion on that.
> …
> Q So just to be clear, have you developed a framework to statistically assess the differential between what Progressive actually pays and what it should pay?
> A What makes me nervous about the question is the "should pay."
> Q So you have not done that?
> A I've not developed any statistical analysis for anything yet.
> Q Okay. Thank you. Have you reached any opinions about whether any alleged member of the Class has suffered any injury or damage?
> A No.

(Ex. R at 29:19–32:2). Hassell further has no opinion regarding any of Plaintiff's various complaints concerning the way Progressive adjusted his claim in light of condition. (*Id.* at 32:3–33:12).

Simply put, McCauley confirms that valuing a total-loss vehicle requires individual inquiry and Hassell confirms that she has not designed a method to determine injury and damages for any member of the purported class, much less a common method to make this essential determination for all of them. This is entirely consistent with the opinion of expert economist Dr. Jonathan Walker. (Ex. S, ¶ 1). After reviewing the entire record, Dr. Walker opines that "there is no reasonably manageable method within the framework of a class proceeding to identify which class members, if any, suffered any injury as a result of Progressive's alleged misconduct or to estimate damages reliably for the class as a whole or its individual members." (*Id.*). As Dr. Walker explains, "Proving injury and quantifying damages would require individualized analyses pertaining to each of the tens of thousands of putative class members." (*Id.*).

## III.   ARGUMENT

### A.   Plaintiff Bears The Burden Under Rule 23

Class actions are "exception[s] to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). To proceed on an aggregate basis, Plaintiff "bear[s] the burden of demonstrating that" he has "met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). This Court, in turn, must "engage in a 'rigorous analysis' of each Rule 23(a) factor" when determining whether Plaintiff has satisfied this burden. *Id.* at 980 (remanding case with direction to conduct the required rigorous analysis). This "rigorous analysis . . . sometimes [requires] the court to probe behind the pleadings" and consider "the merits of the class members' substantive claims." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013).

Specifically, under Rule 23(a), the Court must determine whether Plaintiff has established that the four requirements of "numerosity, commonality, typicality, and adequacy of

13

representation" are satisfied. *Id.* at 542. If—after a rigorous analysis—the Court determines that the four prerequisites of Rule 23(a) are satisfied, the Court must also find that Plaintiff "through evidentiary proof" satisfies "at least one of the three subsections of Rule 23(b)." *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 315 (N.D. Cal. 2014) (citing *Comcast Corp.* 569 U.S. at 33). As the United States Supreme Court has explained: "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, Plaintiff has fallen far short of satisfying his burden of presenting evidence that "affirmatively demonstrate[s]" his compliance with any of the requirements of Rule 23. The Court's "rigorous analysis" accordingly will show that Plaintiff has not and cannot bear his burden on class certification and the Court should deny the Motion.

### B.  Individual Issues Predominate

#### 1.  The dealer quote valuation process is inherently individualized.

The only class Plaintiff conceivably could represent would be a class of California insureds who—like Plaintiff—had a total-loss claim adjusted by Progressive using the manual dealer-quote valuation process. *See Dukes*, 564 U.S. at 349 (Rule 23(a) "effectively limit[s] the class claims to those fairly encompassed by the named plaintiff's claims"); *see also Santos v. TWC Admin. LLC*, 2014 WL 12558009, at *16 (C.D. Cal. Aug. 4, 2014) ("In order to have standing to represent a class, a named plaintiff must allege and show that she has personally been injured by the practice that is challenged."); *Lierboe v. State Farm Mut. Aut. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (explaining that if the plaintiff "has no stacking claim, she cannot represent others who may have such a claim, and her bid to serve as a class representative must fail"). Plaintiff essentially concedes as much, explaining that the purported class is "sufficiently numerous" because Mitchell provided Progressive with "approximately 3600 . . . valuations obtained through a manual dealer quote system." (Mot. at 17). Plaintiff also admits that his claim is "different" because he "ultimately went through the dealer quote process." (Mot. at 20). The manual dealer-quote valuation process, however, is far too individualized to serve as the basis for classwide adjudication of any of Plaintiff's claims.

1    Plaintiff alleges that dealer-quote valuations are "deceptive" because Mitchell "ha[s] a

2  practice to not contact licensed dealers," and simply fabricates the quotes provided on the

3  valuation reports. (TAC ¶ 34). Yet Plaintiff also claims that in his case, Mitchell did make calls

4  to the dealers, but the dealers allegedly refused to give a quote and Mitchell therefore made up

5  one of the quotes. (Ex. F at 98:7–99:21).  Finally, Plaintiff claims that dealer quote valuations are

6  "deceptive" because they led him to "believe that the cars were on the lot" of the dealer who

7  provided the quote. (*Id.* at 111:25–112:10). The variations in Plaintiff's theory of the alleged

8  defects in the dealer-quote valuation process, alone, show that any claim based on the dealer-

9  quote valuation process is far too individualized for classwide adjudication.

10    To obtain a dealer quote, a Mitchell representative calls an individual dealership—largely

11  of the Mitchell representative's choosing—that is in close proximity to the loss vehicle. (Ex. B at

12  36:5–37:20 (there is no "hard guidance" on how to choose the dealership); *see also* Mot. at 3

13  (explaining that "a representative calls a dealer and secures a telephonic quote for a vehicle

14  described over the phone")). The type of dealership contacted typically depends on the year of

15  the loss vehicle. (Ex. B at 36:7-21). And the discussion Mitchell has with the dealer focuses on

16  the unique characteristics of the loss vehicle, including its condition. (Ex. C at 82:15-24). The

17  outcome of this process is driven by individual factors such as the Mitchell representative

18  involved, the loss vehicle (including its location and condition), and the dealer on the other end

19  of the telephone conversation. As Plaintiff himself observes: ultimately, "whether the[] [dealer]

20  give[s] you a price or not is up to them." (Ex. F at 103:11-18).

21    Plaintiff has not even attempted to demonstrate a common method of determining (i)

22  whether Mitchell actually calls dealers, (ii) whether Mitchell accurately describes vehicles'

23  condition in these calls, (iii) whether dealers provide quotes, or (iv) whether individual insureds

24  are misled into believing that a dealer quote means the dealer has the physical vehicle on their

25  lot.[3]  Nor are these questions capable of classwide proof. For example, Plaintiff's allegation that

26

27  ───────────────

[3] The evidence shows that in Plaintiff's case, telephone calls were made to both Calidad Motors

28  and Ace Auto Dealers.  (Mitchell-Jones00000197–200 (Ex. T); Mitchell-Jones00000202–205

one of the dealers allegedly refused to give Mitchell a quote in his case—the crux of his claim—is based entirely on a hearsay conversation he allegedly had with the dealer when he received his valuation report. If that evidence were admissible at all (and it likely is not), it would only be available through individual testimony and cross-examination of witnesses at trial. (Ex. F at 98:7–99:21). Because the individualized issues implicated by the dealer-quote process are numerous and insurmountable, the Court should deny Plaintiff's Motion. *See Brown v. Nat'l Life Ins. Co.*, 2013 WL 12096508, at *4 (C.D. Cal. Oct. 15, 2013) (denying certification where "Plaintiff's only evidence to support his claim appears to be oral misrepresentations made to him personally and his own individual assumptions," rather than "evidence that Defendant made such representations to any other member of the putative class").

> **2.     Plaintiff has not met his burden of identifying any common questions that will predominate over the myriad individual issues involved in valuing total-loss claims.**

To the extent Plaintiff seeks certification of the purported subclasses concerning alleged practices other than the use of dealer quotes—*i.e.*, classes involving Progressive's use of salvage-title vehicles as comparable vehicles and alleged "double dipping" for condition—those practices were not used in settling his total-loss claim, and he cannot represent a class to prosecute them. *Santos*, 2014 WL 12558009, at *16 (citing authority for proposition that named plaintiff must show "injury as a result of the practices" challenged). Nor could Plaintiff satisfy Rule 23(a)'s typicality requirement. *See infra* Section III.C.iii. Even setting those defects aside, Plaintiff's convoluted assertions about his ability to answer the "key legal dispute[s]" with "common evidence" shows just how rife with individual questions these alleged practices are. (*See* Mot. at 22-23 (concluding that the "condition reports that resulted in double dipping and low ball pricing" can "be answered on a class basis")).

In essence, Plaintiff contends that class certification is appropriate based on the unsupported assertion that Progressive uses WCTL to "lowball" its first party insureds, pay "less

---

(Ex. U); Mitchell-Jones00000027 (Ex. V) (journal entry showing that "per new condition had to re DQ spoke to same dealerships and was lucky enough to get same sales agent")).

Progressive's Opposition to Class Certification                    Case No. 3:16-cv-06941 JD

than actual cash value," or less than "adequate" compensation. (Mot. at 1-2 (class definitions); Mot. at 16 (identifying the "overarching common question on liability" as "whether . . . the Mitchell WCTL reports were allowing Progressive to settle claims . . . at lower than actual cash value")). But the only way to determine whether Progressive "lowballed" *any* insured is to determine the "actual cash value" of the total-loss vehicle, or what "adequate" compensation would be, to make a comparison to the amount Progressive paid. Regardless of the methodology used, the valuation process involves evaluation of the condition of the total-loss vehicle, various possibilities with respect to the process of selecting comparable vehicles, and an ongoing dialogue between Progressive and the insured as to a final settlement amount. *See supra* Section II.A.–C. As Plaintiff's own claim exemplifies—and experts with opinions on this issue confirm—that is a highly individualized process. (Ex. S, ¶ 7 ("the value of any used vehicle is an individualized and vehicle-specific inquiry"); Ex. E at 102:1-14 (individual "[m]ileage and condition are [] the two biggest things" in determining actual cash value)).

For example, Plaintiff contends that he received "less than he would have received had the condition of his vehicle [] been compared to the condition of the vehicles for which comparable vehicles were obtained." (Mot. at 13). And Plaintiff poses the "common question" of "whether the condition rating system overall resulting [*sic*] in Progressive reducing the price of the vehicle twice." (Mot. at 22). Setting aside that Plaintiff's claim was not settled on the basis of comparable vehicles, there is no common way of proving that other insureds were paid less than actual cash value because the condition of their loss vehicle was allegedly not compared to the condition of the comparable vehicles. As the Fifth Circuit explained in its order vacating and remanding class certification in *Slade*, "condition adjustments appear to be highly individualized." *Slade*, 856 F.3d at 412 (noting that a challenge to condition adjustments presents "predominance problems" for class certification). The only way to answer the question of whether an insured "would have received [more] had the condition of his vehicle [] been compared to the condition" of the comparable vehicle (Mot. at 13) is to revisit each insured's individual claim, inspect the condition of the comparable vehicles (if possible), and perform an individual comparison of the condition of the total-loss vehicle to the condition of the

17

comparable vehicles.  Plaintiff's own expert confirms the need to individually inspect vehicles for condition to determine their value. (Ex. E at 33:11–37:22). Plaintiff fails to explain how determining the appropriate condition adjustments could be done on a common basis other than to say that it can be done by "backing out the process of double dipping." (Mot. at 23). This is woefully insufficient to "satisfy through evidentiary proof" that Rule 23(b)(3) is satisfied. *Comcast Corp.*, 569 U.S. at 33.

The process for determining whether any comparable vehicle has a salvage title is also highly individualized. Plaintiff admits that it would be done by "reviewing the comparable submitted by Progressive and Mitchell" for each claim. (Mot. at 23).[4] Plaintiff's car valuation expert confirms that to perform a title search "you do that one VIN at a time." (Ex. E at 39:3–40:6, 49:10–50:5 (agreeing there would be no way to look at a hundred vehicle titles all at once)). Moreover, if any salvage-titled vehicles were discovered among the thousands of comparables used over the years, individual and subjective analysis would be required to adjust total-loss valuations for such vehicles. (*Id.* at 81:11-18). Plaintiff has failed to provide any alternative approach that can be applied commonly across the proposed class. The Court should not certify a class that would require a file-by-file review of individual title searches to determine Progressive's liability as to each purported member of the class. *See Stockwell v. City and County of San Francisco*, 2015 WL 2173852, at *11 (N.D. Cal. May 8, 2015) (denying certification because "each member of the class would need to present individualized evidence," and "each class member's claim would need to be evaluated on an individualized basis"); *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 485-86 (C.D. Cal. 2008) (decertifying class where the "evidence is essentially individual testimony" that would make any classwide judgment "merely speculative").

---

[4] There is no evidence of any Progressive or Mitchell policy to use salvage-title vehicles as comparables for total-loss valuations.  In fact, the evidence shows that Mitchell has a complex filtering process in place designed to try to exclude prior total-loss or salvage title vehicles.  (Ex. C at 29:11-24; Ex. B at 45:24–46:25).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 3.       Plaintiff fails to present a damages methodology that aligns with his theories of liability.

In *Comcast Corp. v. Behrend*, the Supreme Court explained that for certification under Rule 23(b)(3), a plaintiff must provide evidence of a damages model "consistent with its liability case," establishing "that damages are susceptible of measurement across the entire class." 569 U.S. at 35; *see also Rahman v. Motts LLP*, 2014 WL 6815779, at *7 (N.D. Cal. Dec. 3, 2014) (to satisfy predominance plaintiff must show "that damages are capable of measurement on a classwide basis" and "that there is a nexus between his theory of liability and his method of proving damages"). Here, Plaintiff claims that there is a "common course of conduct . . . from which a finder of fact could make a common finding of liability . . . as well as determine a common, formulaic method for measuring individual damages." (Mot. at 11). But Plaintiff has neither identified a common course of conduct nor a "formulaic method" for measuring damages that has any nexus whatsoever to his many theories of liability. *See In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *15 (N.D. Cal. Sept. 14, 2016) (explaining that if a plaintiff does not offer a damages model that matches his theory of liability, "the problem is not just that the Court will have to look into individual situations to determine the appropriate measure of damages; it is that Plaintiffs  have not even told the Court what data it should look for").

Plaintiff offers Hassell's testimony in support of his conclusion that damages can be calculated on a classwide basis. But Hassell expressly disclaimed under oath that she was providing any expert testimony whatsoever regarding damages for this case. (Ex. R at 29:3–33:12). Hassell's only conclusion is that she can develop "comparisons between valuations by the WCTL system, the NADA system, and the Bluebook systems for each member of the Class." (Dkt. 130-16, ¶ 66; Ex. R at 30:4-7 ("The only thing I'm offering an opinion on is the availability of the data and the ability to . . . manipulate it.")). Plaintiff offers no explanation for how comparing WCTL valuations to the NADA Guide's estimated values can demonstrate whether WCTL results in payments that are less than actual cash value. Nor does Hassell express an

Progressive's Opposition to Class Certification                    Case No. 3:16-cv-06941 JD

opinion of "which of the alternative valuations is the most accurate" or even whether Progressive undervalued Plaintiff's vehicle. (Ex. R at 29:19–30:11).

Plaintiff also fails to explain how the NADA Guide or the Kelly Blue Book have anything to do with whether WCTL "double dips" for condition or uses salvage-title vehicles as comparables. Indeed, users of the NADA Guide and the Kelly Blue Book are instructed to make individual and subjective adjustments to any valuation those guides derive from their comparable databases based on the actual condition of their vehicle.  (McCauley Dep. Ex. 5 (Ex. W); Ex. E at 77:22–78:16; McCauley Dep. Ex. 6 (Ex. X) (Kelly Blue Book explains determining condition is "a judgment call")). The NADA Guide recognizes that "The process by which users of the Guide determine valuation is inherently subjective. ***Individual vehicles may have an actual value that is higher or lower than the estimated values published in the NADA Official Used Car Guide***." (Ex. X (emphasis added)). While Plaintiff asserts that "[u]sing data compiled by NADA or Kelly Blue Book, you can determine how much each insured deviated from that average" (Mot. at 23), this does not answer for any insured whether their vehicle was undervalued by Progressive's allegedly deceptive valuation practices. Plaintiff's proposed comparison is thus insufficient to carry Plaintiff's burden on class certification because Plaintiff cannot satisfy the predominance requirement with a damages model that has no connection whatsoever to Progressive's alleged misconduct. *Bruton v. Gerber Products Co.*, 2018 WL 1009257, at *12 (N.D. Cal. Feb. 13, 2018) (denying certification because plaintiff "failed to provide a meaningful explanation" as to how his damages model would measure "only those damages attributable" to the defendant's conduct); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *14 (N.D. Cal. Dec. 15, 2014) (explaining that "the mismatch between the damages model and the plaintiff's liability case made class certification inappropriate under Rule 23(b)(3)").

In an attempt to gloss over these glaring limitations in Hassell's expert opinions, Plaintiff misstates Hassell's conclusions. Plaintiff falsely claims that Hassell "developed a framework by which she can statistically assess the differential between what Progressive actually pays and what it should pay if it were not double dipping by essentially making deductions for conditions

on two occasions." (Mot. at 15). Hassell did no such thing, which she confirmed in her deposition. (Ex. R at 31:22-23 ("I've not developed any statistical analysis for anything yet."); *id.* at 33:8-12 ("Are you offering an opinion regarding alleged double dipping by Mitchell or Progressive? No, I'm not")). Hassell expressly testified that she has no opinion, nor any expertise, to determine how much Progressive should have paid Plaintiff or any other insured for a total-loss vehicle. (*Id.* at 29:3–30:23). Hassell opines only that she thinks a computer database could be created to compare NADA or Kelly Blue Book values to WCTL values. Hassell offers no opinion regarding injury or damages, any of Plaintiff's claims regarding condition adjustment, "double dipping," or use of salvage-title comparable vehicles.

In sum, Plaintiff has failed to provide a methodology capable of measuring his own alleged damages, much less one that aligns with his theories of liability and would be capable of measuring classwide damages. His Motion accordingly falls far short of establishing the predominance requirement of Rule 23(b)(3). *Comcast*, 569 U.S. at 35; *see also Nguyen v. Nissan N. Am., Inc.*, Case No. 16-CV-05591-LHK (Dkt. No. 63, Order Denying Motion for Class Certification, pp. 9-10) (N.D. Cal) (denying class certification because the plaintiff's "damages model [] errs in assuming"—without any justification—that the defective product was "completely valueless," and thus was "not an appropriate measure of damages").

### C. Plaintiff Cannot Satisfy the Requirements of Rule 23(a)

#### 1. Plaintiff has not presented evidence that the putative class is sufficiently numerous.

Remarkably, Plaintiff does not seek to represent a class of Progressive insureds whose total-loss claims were valued in California using the dealer quote valuation process (Mot. at 1-2), although Plaintiff does contend that the numerosity requirement is satisfied because 3,600 individuals had claims valued in California "obtained through a manual dealer quote process." (Mot. at 17). In any event—assuming Plaintiff did attempt to represent a class of California insureds whose total-loss claims were valued using the dealer quote valuation process, Plaintiff has not presented evidence that such a purported class would be sufficiently numerous.

The only evidence Plaintiff presents of Mitchell's alleged fabrication of dealer quotes is his own hearsay testimony that he called the dealers on his valuation report, one of which told him he refused to give Mitchell a quote. (Ex. F at 98:7–99:21). Plaintiff has failed to present any evidence of a single prospective class member who was subject to the same alleged fraud. *See Hargreaves v. Associated Credit Servs., Inc.*, 2017 WL 4543791, at *3 (E.D. Wash. Oct. 11, 2017) (denying class certification because the plaintiff "failed to provide concrete evidence of a single prospective class member other than Plaintiff[]").  Plaintiff thus fails to carry his burden of demonstrating the numerosity required to support certification of a class of insureds whose total-loss claim was valued—like his—on the basis of allegedly fraudulent dealer quotes. *See, e.g.*, *Siles v. ILGWU Nat. Ret. Fund*, 783 F.2d 923, 930 (9th Cir. 1986) (affirming denial of class certification where plaintiff presented no evidence as to how many of the 31,000 plan members were denied benefits in circumstances similar to the plaintiff); *Diacakis v. Comcast Corp.*, 2013 WL 1878921, at *5 (N.D. Cal. May 3, 2013) (denying certification because "Plaintiff offers no evidence regarding the number of th[e] [649,576] subscribers who were allegedly misled by Comcast," and "[t]he mere fact that there are numerous [] subscribers, standing alone, is insufficient to show numerosity").

### 2.     There are no common questions of fact or law.

The commonality analysis "begins . . . with the elements of the underlying causes of action" and whether they "are subject to common proof." *In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555, 564 (N.D. Cal. 2013). To establish commonality, it "is insufficient to merely allege any common question," Plaintiff "must pose a question that will produce a common answer." *Ellis*, 657 F.3d at 981. Plaintiff's Motion fails to mention a single one of his claims against Progressive, let alone identify the elements of those claims in order to demonstrate that they are subject to common proof.  Plaintiff continues to hurl every conceivable complaint against Progressive's total-loss valuation process, irrespective of the total lack of supporting evidence, hoping one will stick.  But the Court cannot certify a class without Plaintiff identifying common questions, and common answers to those questions, that will drive classwide adjudication of his claims.

The common questions Plaintiff describes are not common at all, and certainly are not capable of being answered by common evidence in a classwide proceeding. (*See* Mot. at 18). In sub-parts (c) through (f) of the purported common questions, Plaintiff merely poses the generic question—untethered to any of Progressive's allegedly unlawful policies—of whether Progressive has violated the law. (Mot. at 18-19). Simply "[r]eciting the[] question[]" "[i]s that an unlawful [] practice?" is insufficient to establish commonality. *See Dukes*, 564 U.S. at 349. Sub-parts (a) and (b) ask whether Progressive has a practice of rating the condition of loss vehicles that "resulted in double dipping," and whether Progressive "knowingly used salvage title vehicles." (Mot. at 18). These questions are not common; they simply restate Plaintiff's conclusory allegations. Plaintiff has made no effort to demonstrate that a classwide proceeding could generate common answers to these questions. Because it is "common answers" to questions that satisfy the commonality requirement of Rule 23(a), Plaintiff's Motion fails. *Wang*, 737 F.3d at 543 ("What matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.").[5]

### 3.    Plaintiff's claims are atypical.

Typicality exists only if Plaintiff's "claims arise from the same event, practice or course of conduct that gives rise to the claims of the absent class members and if their claims are based on the same legal or remedial theory." *In re Optical*, 303 F.R.D. at 316. Typicality "refers to the nature of the claim or defense of the class representative" and whether "other class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984. "In evaluating typicality, the court should consider whether the named plaintiffs' individual circumstances are

---

[5] Plaintiff also concludes that the "common question" whether Progressive pays "lower than actual cash value" can be answered using "evidence in the form of Defendants' contracts and agreements, Defendants' estimates and records of the amount of time necessary to complete the daily maintenance, Defendants' accounting and payment records." (Mot. at 16). First, Plaintiff does not have any of this "evidence." Second, it is unclear how this alleged evidence would have any bearing on the actual cash value of the loss vehicles of the purported class members.

Progressive's Opposition to Class Certification                    Case No. 3:16-cv-06941 JD

markedly different." *In re Optical*, 303 F.R.D. at 317-18 ("[T]he disparity between the named class members would preclude certification of the class as currently proposed"). "A proposed class representative is not typical if his or her claims are subject to time-consuming specific defenses that would not apply to absent class members." *Tietsworth v. Sears, Roebuck and Co.*, 2012 WL 1595112, at *16 (N.D. Cal. May 4, 2012).

Plaintiff's circumstances are "markedly different" from the insureds he seeks to represent. Over 90% of total-loss claims in California are valued using the automated WCTL process. Plaintiff's claim, however, was not. Plaintiff's claim was settled on the basis of quotes from licensed dealers in the local market area—not on the basis of comparable vehicles. This means that Plaintiff was not injured by the vast majority of the allegedly unfair practices he challenges, *i.e.*, the "double dipping" for condition and use of salvage title vehicles. Plaintiff therefore would be subject to unique defenses that would not apply to absent class members. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (holding the named plaintiff did not satisfy the typicality requirement because his "unique background and factual situation require[d] him to prepare to meet defenses that [were] not typical of the defenses which may be raised against other members of the proposed class"). The disparity between Plaintiff and the classes he seeks to represent provides an independent basis for denying class certification.

### D.   Plaintiff Fails To Meet The Requirements For Certifying A Rule 23(b)(2) Injunctive Class.

Plaintiff seeks certification of an injunctive relief class broadly defined as insureds in California who "received comparable vehicle information from Progressive or Mitchell for their first party total vehicle property class" (Mot. at 1), and asks for an injunction "that prohibits both Progressive and Mitchell from using the WCTL system to adjust claims." (Mot. at 21). Plaintiff's request for an injunctive relief class fails because "certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2011). Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360-61. The "dispositive question" is "[w]hat type of relief does

[Plaintiff] primarily seek?" *Zinser*, 253 F.3d at 1195-96 (denying certification of Rule 23(b)(2) class for injunctive relief in the form of "research into alternative methodologies" because it was "merely incidental to the primary claim for money damages").

The primary relief sought by Plaintiff here is monetary relief in the form of compensatory damages for the amount each purported class member allegedly was underpaid by Progressive for the value of their total-loss vehicle. (Ex. F at 32:19-20). Indeed, Plaintiff seeks certification of a monetary relief class with the exact same definition as the proposed injunctive relief class—California insureds who "received comparable vehicle information from Progressive." (Mot. at 2). Plaintiff's request that the Court enjoin Progressive from using WCTL in the future is merely incidental to Plaintiff's claim for money damages; therefore, certification under Rule 23(b)(2) is not appropriate.  *Zinser*, 253 F.3d at 1195.

### E.   Plaintiff Fails To Demonstrate That Any "Issue" Class Can Be Certified Under Rule 23(c)(4).

The Court should reject Plaintiff's request for certification of a Rule 23(c)(4) issue class out of hand. Plaintiff dedicates a mere two paragraphs to contending that the "court may certify an issue class pursuant to Rule 23(c)(4) to determine Defendants' liability." (Mot. at 25). Plaintiff does not even state what the "issue" for certification is, describing the issue only as "Plaintiff's class-wide liability claims." (*Id.*). This is entirely deficient to demonstrate the propriety of a Rule 23(c)(4) issue class.  In any event, for the reasons stated above, Plaintiff's liability claims are highly individualized and thus not appropriate for class treatment.

## IV.   CONCLUSION

For these reasons, Plaintiff's Motion for Class Certification should be denied.


DATED:  April 16, 2018                    KING & SPALDING LLP

                                          By: */s/  Timothy T. Scott*
                                          Timothy T. Scott

                                          *Counsel for Defendants*
                                          PROGRESSIVE SELECT INSURANCE
                                          COMPANY and PROGRESSIVE CASUALTY
                                          INSURANCE COMPANY